

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 09-24547-D-7 |
| LAURENCE R. NICHOLSON and JOYCE V. NICHOLSON, | Docket Control No. TAA-2 |
| Debtors. | Date: November 10, 2010<br>Time: 10:00 a.m.<br>Dept: D |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM DECISION

By amended opinion dated July 29, 2010, the Bankruptcy Appellate Panel of the Ninth Circuit held that this court had applied an incorrect burden of proof, and thus remanded to this court the objection of chapter 7[1] trustee Thomas A. Aceituno (the "trustee") to the claim of exemption of Laurence R. Nicholson ("Nicholson") and Joyce V. Nicholson (together the "debtors") in 25 shares (the "shares") in Applied Science, Inc. ("ASI"), representing a 50% ownership share. <u>Tyner v. Nicholson (In re Nicholson</u>, 435 B.R. 622, 637 (9th Cir. BAP 2010). This court has reconsidered the matter in light of the correct burden of proof, and for the reasons set forth below, the court will overrule the objection.

---

    1. Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Tyner's request to reopen the record and for an evidentiary hearing is denied.  Neither the Federal Rules of Bankruptcy Procedure nor this court's local rules give parties the right to file a statement of disputed facts or the right to an evidentiary hearing following remand from an appellate court,[2] and this court has no need for an evidentiary hearing in order to determine the issues under the correct burden of proof.  ASI's attempt to join Tyner as an objecting party -- following remand and well beyond the 30-day deadline (see Rule 4003(b)(1)) -- also comes too late.

### I.  BACKGROUND

In their original Schedule B, filed with their petition on March 16, 2009, the debtors listed the shares as having a value of $0, with the explanation that ASI had $468,711 in assets and $860,726 in liabilities.  The debtors described the shares as "worthless" and did not claim them as exempt.

Following the conclusion of the meeting of creditors, the trustee filed a report of no distribution, to which Karen Tyner ("Tyner"), successor in interest to Cliff Tyner as the co-owner of ASI, objected.  Tyner asserted that ASI, at Nicholson's direction, was undertaking an appraisal of the shares, and contended the shares "may have material value."[3] [4]

---

2.  Tyner argues she failed to file a timely statement of disputed material factual issues because the debtors had failed to serve her with their opposition to the trustee's objection.  However, Tyner did not, at the time she filed her reply or at all, request additional time to file a separate statement, and she did not request an evidentiary hearing until after the debtors' counsel, at the hearing, objected to her exhibits as unauthenticated.

3.  Tyner's Objection to Chapter 7 Trustee's Determination
(continued...)

On July 28, 2009, the trustee filed a motion to approve the sale of the shares to Tyner for $5,000. The trustee's agreement with Tyner provided:

> If the Debtor makes a claim of exemption in [the shares], the Buyer [Tyner] will have the option to increase the purchase price to cover the full amount of the claim of exemption (i.e. $5,000 plus the claim of exemption) or to cancel the sale.[5]

The debtors then filed three sets of amended schedules, ultimately listing the value of the shares as $25,000 and claiming an exemption of $19,949 in them.[6] The debtors also objected to the trustee's motion to sell the shares on the basis that the purchase price would need to be sufficient to pay their claim of exemption.

At a hearing held August 19, 2009, the court entertained overbidding and approved the sale of the shares to Rostrevor Partners, LLC ("Rostrevor") for $25,949.[7] The trustee made it

---

3. (...continued)
of No Distribution, filed June 5, 2009, p. 2.

4.  Tyner also filed a timely joinder in the trustee's objection to claim of exemption. Thus, the court has considered the joinder, reply, and evidence submitted by Tyner, and the findings and conclusions contained herein apply equally to Tyner.

5.  Motion for Sale of Assets Free and Clear of Liens and Declaration of Thomas A. Aceituno, filed July 28, 2009, ¶6(f).

6.  The variances among the schedules filed July 28, July 31, and August 17, 2009 are insignificant to this decision.

7.  Rostrevor had a connection with Tyner -- its managing partner, Jonathan Morgan, had been advising Tyner about ASI for the previous two months and had been sufficiently involved in her negotiations with the trustee to be able to testify that "[t]hose negotiations were . . . at arms' length and in good faith." Supplemental Declaration of Jonathan Morgan in Support of Finding of Good Faith and Waiver of Stay of Fed. R. Bankr. P. 6004(h), filed August 19, 2009 ("Morgan Decl. I"), ¶3.

clear at the hearing that Rostrevor would receive back $19,949 of the purchase price if the court sustained the objection to the debtors' exemption claim.[8] In other words, if the objection is sustained, Rostrevor will have paid $6,000 for the shares; if it is overruled, it will have paid $25,949.

## II. THE BASIS OF THE OBJECTION

The trustee and Tyner contend that the debtors knowingly misrepresented the value of the shares at $0 in the hope that the trustee would abandon them without further inquiry, that they withheld from the trustee information that would have caused him to conclude the true value was something else, and that the debtors amended their exemption claim only after the trustee filed his motion to sell the shares, with the intention of preventing the sale or at least recovering value for an asset they had previously represented as worthless.

The trustee and Tyner offer two bases for their contention that the shares in fact had a value greater than $0 -- first, that Tyner made an offer and Rostrevor actually purchased them, and second, that the shares had value because of the possibility of a contract between ASI and Pall Medical, a large medical company.

## III. ANALYSIS OF THE EVIDENCE

Following remand and a hearing on November 10, 2010, the court has reviewed the evidence submitted in support of and in opposition to the objection in light of the correct burden of

---

8. Reporter's Transcript of Court Proceedings on Trustee's Objection to Claims of Exemption, filed December 1, 2009 ("Hearing Transcript"), 11:14-20.

proof, which is that the party objecting to a claim of exemption must overcome the presumptive validity of the exemption by a preponderance of the evidence. Nicholson, 435 B.R. at 630, 634. The evidence must be "'sufficient to persuade the finder of fact that the proposition is more likely true than not.'" Nicholson, 435 B.R. at 631, quoting United States v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 654 (9th Cir. BAP 1994).

> "Bad faith [in claiming exemptions] is determined by an examination of the 'totality of the circumstances.'" "Concealment of assets is the usual ground for a finding of 'bad faith.'" However, "a debtor's intentional and deliberate delay in amending an exemption for the purpose of gaining an economic or tactical advantage at the expense of creditors and the estate [also] constitutes 'bad faith.'"

Nicholson, 435 B.R. at 634, citations omitted.

The court has considered the totality of the circumstances in this case to determine good faith by a preponderance of the evidence. The evidence does not persuade the court that it is more likely than not the shares were worth materially more than the value assigned them by the debtors on their original Schedule B. The court is also not persuaded that it is more likely than not that the debtors attempted to conceal any greater value in the shares, misled the trustee, deliberately or not, or delayed claiming the shares as exempt with any intention other than that they simply thought the shares had no value they needed to claim as exempt.

**A. Disclosure**

First, the debtors never concealed the shares -- they disclosed them at the beginning of the case, together with the

assets versus liabilities measure on which they based their determination that the shares had no value. The debtors did not claim the shares as exempt on their original Schedule C, which the trustee and Tyner contend is evidence the debtors sought to conceal their value. The court finds this more likely supports the inference that the debtors believed the shares had no value they needed to exempt. The total claimed by the debtors under the "wild-card" exemption, Cal. Code Civ. Proc. § 703.140(b)(5), on their original Schedule C was $1,876, leaving $19,949 unused and available. All parties would have known that amount was available to the debtors should there prove to be some value in the shares.

The shares were discussed at the meeting of creditors, where Nicholson testified that "the corporation's been doing pretty bad,"[9] that at times, it did not have enough money to meet payroll, and that it was considering bankruptcy. He described the nature of the business, the fact that the building where the business was operated was owned by the debtors and ASI's co-owner, whom he identified as Tyner, and the fact that the value of that real property was substantially less than the amount of the liens against it.[10]

/ / /

---

9. Transcript of § 341 meeting, attached to debtors' request for judicial notice, filed October 8, 2010 ("341 Transcript"), 7:4-8.

10. This conclusion is supported by the motion for relief from stay filed by Citibank six months into the case, contrasting the value of the property with the amount of the liens against it, and stating that the borrowers, defined as including the debtors and the Tyners, had failed to make any payments on the loan since March 2008, a year before this case was commenced.

The trustee emphasizes Nicholson's statement that "there is no value because the corporation owes a considerable amount of money,"[11] whereas Nicholson added, "We're -- we're hoping that maybe something will change, but we don't know."[12] The trustee immediately changed the subject and did not return to ask on what basis Nicholson hoped something might change. The trustee never requested financial statements, balance sheets, or copies of open contracts, and he never asked the debtors or their counsel about the Pall Medical prospect after it came to his attention. In short, the trustee had every opportunity to poke and prod, yet he chose not to.

**B. The Debtors' Beliefs and Motives**

"[A] debtor's subjective intent is an important, although not determinative, factor in determining bad faith." Nicholson, 435 B.R. at 635, citing Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994). Thus, the court examines what Nicholson knew and believed about the shares at the time he valued them at $0, as well as what he did not know.

The trustee accepted without further investigation Tyner's offer to pay $5,000, with the caveat that if the debtors amended their claim of exemptions, Tyner could increase her offer to cover it or cancel the sale.[13] Presumably, the trustee concluded that the only person to whom the shares might have any value was

---

11. Objection to Claims of Exemption and Declaration of Thomas A. Aceituno, filed August 12, 2009, ¶3.

12. 341 Transcript, 10:12-14.

13. The caveat demonstrates that it was within the contemplation of both the trustee and Tyner that the debtors might amend their exemptions to claim the shares.

Tyner, as the co-owner of the company.  There is no evidence the trustee solicited other offers, and neither the trustee nor Tyner has suggested that anyone other than Tyner and persons connected with her may have had an interest in the shares.

Noticeably missing is any evidence Nicholson knew Tyner might want to buy his shares or be in a position to do so.  In fact, it may reasonably be inferred she believed the shares to be worth only $5,000, as her offer provided she could cancel the sale if the debtors claimed the shares as exempt.  In addition, Morgan, who had been advising Tyner about ASI, apparently made his decision to purchase the shares (through Rostrevor) only after the debtors claimed the shares as exempt.

> . . . I became aware that the Debtors were attempting to claim certain exemptions, thereby potentially increasing the ultimate purchase price for the ASI shares.  At that point I made an independent investment decision to bid on the ASI shares.[14]

In short, there is no reason Tyner's subsequent willingness to make an offer and ability to bring in an investor should play any role in determining the debtors' good or bad faith in listing the value of the shares at $0 at the time the case was commenced.

Next, shares in closely-held companies are inherently difficult to value, especially shares in a closely-held corporation that relies on the knowledge of its principals for its success.[15]  Certainly, one cannot put value on an asset that

---

14.  Morgan Decl. I, ¶4.

15.  "Valuing a closely held corporation is always difficult and when that business is heavily dependent upon the performance of a single person, this fact is perhaps the single most important factor in the valuation."  <u>Wachovia Bank, N.A. v.</u>
(continued...)

- 8 -

is premised on a principal's knowledge if that knowledge is going to be removed.[16] Entering into a contract, especially with a small company, is almost always premised on the continued involvement of the company's principals. When the principals will no longer be in the picture, an objective value should not entail the principals' continued ownership of the company's shares or contracts that depend upon their involvement, and there is little basis for valuing the shares other than through its assets and liabilities.

In this case, the only basis for the trustee's and Tyner's assertion of value (aside from Tyner's offer and Rostrevor's overbid, discussed above) was the prospect of a new business arrangement with Pall Medical. The record is clear that there had been only preliminary negotiations by the time the debtors filed their petition and that Nicholson believed his efforts and

---

15.(...continued)
Spitko (In re Spitko), 357 B.R. 272, 315 (Bankr. E.D. Pa. 2006), quoting In re Erdman, 96 B.R. 978, 987 (Bankr. D.N.D. 1988) ["the continued worth of [the debtor's personal] service is entirely too speculative"]; see also Kramer v. Poland (In re Poland), 222 B.R. 374, 380 (Bankr. M.D. Fla. 1998) [debtor did not make a false oath when he listed the value of his shares at zero -- "Defendant believes that his share of stock represents part of a closely held corporation that requires his full participation in order to be a viable business venture."].

16.

> Sentek's value relies largely upon Carl Spitko's personal contacts, experience and skills to generate revenue. If the debtors' interests in this limited liability company were offered for sale, it is not obvious what value Sentek would have beyond its physical assets, if Carl Spitko did not continue his employment. Accordingly, I do not now find that the debtors made a false oath when they disclosed their interest in Sentek, but valued that interest unknown.

Spitko, 357 B.R. at 316.

knowledge would be essential to ASI closing and going forward with the deal. Nicholson testified to his development of ASI's business relationship with Pall Medical in June of 2009 that "led to new sales opportunities for ASI in July and August."[17] He described a "recent increase in sales activity" as "primarily the result of [his] efforts,"[18] and attributed to his performance "the opportunities that only now are surfacing and that were not there when we filed our bankruptcy on March 16, 2009."[19]

Tyner construes this testimony as false on the basis that the Pall Medical prospect was on the horizon as early as March of 2009, not June. She points to an e-mail from Nicholson to Crystal Bunch at Pall on March 4, 2009,[20] and a document entitled "Proposed Distribution Relationship with Pall Medical" dated April 2, 2009.[21] The e-mail appears to be an effort to open negotiations with Pall Medical. Nicholson used the phrase "New Idea for Applied Science relationship" in the subject line and stated, "I propose that Pall become the ASI sales representative

---

17. Declaration of Laurence R. Nicholson in Support of Debtors' Opposition to Trustee's Objection to Claims of Exemption, filed September 16, 2009 ("Nicholson Decl."), ¶3.

18. Id., ¶5.

19. Id., ¶7.

20. Declaration of Jamie Tyner in Support of the Objection to Claims of Exemption, filed October 8, 2009 ("Jamie Tyner Decl."), Ex. B.

21. Declaration of James Bancroft in Support of the Objection to Claims of Exemption, filed October 8, 2009 ("Bancroft Decl."), Ex. A.

in Europe and for the American Red Cross."[22]

The "Proposed Distribution Relationship with Pall Medical" memo states that it

> highlights and discusses some of the issues and subjects needed to be addressed in forging a distribution relationship between Pall Medical and Applied Science (ASI) in preparation for the planned meeting on April 9, 2009 at ASI.[23]

Tyner describes this latter memo as "an agreement with Pall Corporation," and Bancroft calls it "the April 2 Pall Agreement."[24] They are incorrect -- these documents evidence nothing more than the possibility of a future agreement. Although these documents may indicate Nicholson was not completely forthcoming when he testified that he "started developing a business relationship with [Pall Medical] in June of 2009,"[25] the phrase "started developing" is imprecise. Further, this statement does not pertain to the real issues -- whether Nicholson believed the Pall Medical prospect had any meaningful value to ASI as of March 2009, especially without his continued involvement, and thus, whether his reliance on the assets versus liabilities valuation was truthful and appropriate.

It is clear Nicholson believed it was his knowledge that would peek the interest of Pall Medical and allow ASI to close the deal. In a stock buyout proposal Nicholson made to Tyner on

---

22. Jamie Tyner Decl., Ex. B.

23. Bancroft Decl., Ex. A.

24. Declaration of Karen Tyner in Support of the Objection to Claims of Exemption, filed October 8, 2009 ("Karen Tyner Decl."), ¶4; Bancroft Decl., ¶3.

25. Nicholson Decl., ¶3.

April 27, 2009, apparently pursuant to a mandatory buyout provision in Cliff Tyner's employment agreement with ASI,[26] Nicholson stated that "a large percentage of the value that Pall perceives is in the software developments made by and to be continued in the future by Larry [Nicholson]."[27]  In addition, Nicholson apparently made a list of "notes," submitted by Tyner,[28] that supports the same conclusion.  According to the notes, Nicholson believed the value of ASI "is in my knowledge, not the company."[29]  "We need to emphasize with Tyners that the Pall [Medical] deal will not happen without me being involved, that there is intrinsic value to my knowledge."[30]  Given this belief, the court finds no reason to fault the debtors' stated method of valuation -- assets versus liabilities, a valuation that, except with respect to the Pall Medical prospect, has not been challenged.

/ / /

/ / /

---

26.  Cliff Tyner was Nicholson's business partner in ASI and Karen Tyner's husband; he died in January 2009.

27.  Karen Tyner Decl., Ex. A.

28.  Declaration of Jonathan G. Morgan in Support of the Objection to Claims of Exemption, filed October 8, 2009 ("Morgan Decl. II"), Ex. B.

The court determined in its October 22, 2009 decision that Tyner had not laid a sufficient foundation for admission of the notes.  The court finds no reason to depart from that conclusion, but need not decide the issue, in that, as discussed below, consideration of the notes does not change the outcome of this matter.

29.  Id.

30.  Id.

Finally, Tyner emphasizes these statements in the memo:

> If we know that the present value of the shares is worth something, or if the Tyners withdraw suddenly, then the court may say we conspired to conceal the value that the trustee should have known. Quiet is the word. . . . Too much information may cause the trustee to dig deeper and find out about the Pall discussions.[31]

These statements, assuming Nicholson made them, may not reflect what a model debtor would voluntarily disclose to the trustee. However, they do not support a conclusion that Nicholson believed the Pall Medical prospect gave intrinsic value to the shares as of the date of the petition, that his failure to disclose it in valuing ASI's shares at that time was therefore dishonest, or that his delay in amending his exemptions was for the purpose of gaining an economic or tactical advantage at the expense of creditors and the estate.

First, the notes are not dated, but it appears they were made in early July 2009,[32] over three months after the petition was filed. There is no evidence Tyner had responded to Nicholson's April 27 stock buyout proposal; the notes indicate he expected her to make an offer to the trustee instead. This would give her sole control of the company without having to account for a large discrepancy between Cliff Tyner's and Nicholson's compensation in the previous few years.[33] By early July as well,

---

31. Id.

32. Morgan Decl. II, ¶¶10-12.

33. In the stock buyout proposal, Nicholson had set forth in detail his position that as a result of Cliff Tyner's inability to work full-time in the years leading up to his death, coupled with his continued receipt of full salary, there was a

(continued...)

- 13 -

Nicholson had spent time and effort developing the Pall Medical prospect (a point not disputed by the trustee or Tyner), which he perceived would be lost without his continued involvement; at the very least, he would lose any benefit from it.  Finally, he was almost certainly trying to preserve his means of making a living with a company he and Cliff Tyner had developed over a period of 18 years.

    The court concludes the notes are not evidence the debtors conspired to conceal the value of the shares, as Tyner contends; they are evidence the debtors were concerned about how the trustee might perceive the situation.  The memo refers to Tyner's objection to the trustee's report of no distribution as "already presenting some obstacles to getting a deal with Pall."[34]  "We cannot negotiate any deal with Pall until after the August 5 hearing [on Tyner's objection], and we cannot close the deal until September 16 (6 months after the BK filing)."[35]  This does not, as Tyner concludes, reveal a deliberate attempt to delay negotiations with Pall Medical in order to avoid disclosure of those negotiations in the bankruptcy case.

/ / /

---

33.(...continued) $252,364 discrepancy between what Cliff Tyner and Nicholson each had earned as compared with the amount of work each had performed, a discrepancy Nicholson said would have to be balanced in the buyout agreement.  He also emphasized that on a go-forward basis, his contributions to the company would lend it greater and greater value as the value of Cliff Tyner's contributions declined.

34. Morgan Decl. II, Ex. B.

35. Id.

Instead, it is reasonable to infer that Nicholson was concerned his efforts to finalize a deal with Pall Medical might have been jeopardized if Pall Medical learned ASI was not only in financial trouble, but had internal management disputes as well -- the so-called "deadlock" discussed below.  Alternatively, it may be inferred that once the trustee showed an interest in the shares, Nicholson was unwilling to use his knowledge and skills to increase the value of the shares until their disposition was known.  This is a far cry from concealment of assets or intentional misrepresentation of value.

## C. Value of the Shares

The court finds that the price paid for the shares in the bankruptcy sale, a sale that was open to competitive bidding, establishes their value.  Thus, if the objection to the exemption claim is sustained, the value of the shares will prove to have been only $6,000, which underscores the speculative nature of their value.  Even if the objection is overruled and the estate retains the full $25,949, the court will not attribute to the debtors even a suspicion that the shares might bring such a price.  As discussed above, there is no reason to conclude Nicholson knew Tyner might be willing and able to buy the shares.

The various documents submitted by Tyner, discussed above, support the conclusions that the Pall Medical deal was a mere possibility as of the petition date, that it developed into something potentially more lucrative only as a result of Nicholson's post-petition efforts, and that it is likely that the shares had virtually no value as of the petition date. Nicholson's April 27 stock buyout proposal to Tyner makes clear

the Pall Medical proposal was then in its early stages.[36] He described ASI's debts in detail, along with his proposals for resolving them short of payment in full, and noted that the loan on the real property where the business was operated was in foreclosure. He referred to ASI's "dire current financial condition," and stated:

> ASI is currently "under water" in value, estimated at about negative $500K to negative $800K in value. While it is possible over time to improve this, it will take a tremendous effort and careful planning at every step to achieve success.[37]

Finally, he contrasted his "efforts and perseverance that have made it possible to be in negotiations with Pall at all (as opposed to the desire of Tyners to let ASI go bankrupt),"[38] a position Tyner has not denied.

Next, the court disagrees with Tyner's conclusion that the offer Nicholson made for ASI to buy out her shares represented valuation consideration that contradicted his assertion that the shares were worthless. The only cash portion of the buyout offer was for $250; the remaining consideration depended on Nicholson's continued involvement and the company's future performance.

---

36.

> Initially, a distribution agreement has been proposed with Pall Medical. This will help establish the working relationship with less commitment for either party and will expedite coming to an agreement and opening doors for various sales. [¶] If Pall is interested, some form of buyout may be negotiated between ASI and Pall.

Karen Tyner Decl., Ex. A.

37. Id.

38. Id.

Thus, although the consideration for the offer might have proven valuable in the future with Nicholson's continued performance, there is no reason to conclude, either from the proposal or otherwise, that the ASI shares had any meaningful realizable value at the time the proposal was made or at the time of the debtors' bankruptcy filing.

In this regard, the testimony of Rostrevor's managing partner, Jonathan Morgan, is significant. In support of a finding that Rostrevor was a good faith purchaser, he testified,

> In connection with my role of advising Ms. Tyner, I am generally familiar with ASI's cash position and balance sheet. I am also familiar with the fact that, pending the sale of the ASI Shares, ASI has two directors, Ms. Tyner and Mr. Nicholson, a debtor in these cases, who are hopelessly deadlocked as to how to run the business of ASI. Unless ASI is able to obtain financing immediately, ASI is in serious danger of running out of cash to fund its operations within days. In my experience and based on my personal knowledge of ASI, ASI is unable to obtain financing while its board of directors is in deadlock. Immediate consummation of the sale of the ASI Shares is therefore necessary to avoid irreparable harm to ASI.[39]

There is no reason to conclude the situation was any better at the time of the filing, and whatever prospects the company may have had (none is mentioned by Morgan), they were not sufficient to get it past the stage where it needed financing in order to survive.

Finally, it is significant that using the assets versus liabilities method, which again, except for Pall Medical, was undisputed, the shares were upside down by $392,015. No one has suggested that if the Pall Medical deal had been signed at or

---

39. Morgan Decl. I, ¶¶ 6, 7.

shortly after the debtors' bankruptcy filing, it would have resulted in an immediate increase of $392,015 or anything close to that to the asset side of the ledger.  Indeed, neither the trustee nor Tyner has suggested what the true value of the shares, allegedly concealed by the debtors, was or may have been.

### IV.  CONCLUSION

Having reviewed all the evidence in light of the applicable burden of proof, the court is not persuaded that it is more likely than not that the debtors, or either of them, knowingly misrepresented the value of the shares at $0 in the hope that the trustee would abandon them without further inquiry or for any other reason, that they deliberately withheld from the trustee information that would have caused him to conclude the true value was higher, or that their delay in claiming the shares as exempt reflected bad faith on their part, either as an attempt to conceal the value of the shares or to gain an economic or tactical advantage at the expense of creditors and the estate.  Instead, when it became apparent the shares had some value, albeit modest, the debtors merely sought to take advantage of an exemption that, as everyone knew, had been available to them from the beginning.

For these reasons, the court will overrule the objection. The court will enter an appropriate order.

Dated: November 30, 2010

ROBERT S. BARDWIL
United States Bankruptcy Judge

Case 09-24547    Filed 11/23/10    Doc 131

## CERTIFICATE OF MAILING

I, Andrea Lovgren, in the performance of my duties as Deputy Clerk to the Honorable Robert S. Bardwil, mailed, or caused to be mailed, by ordinary mail a true copy of the attached document to each of the parties listed below:

Office of the United States Trustee
501 "I" Street, Suite 7-500
Sacramento, CA 95814

Laurence & Joyce Nicholson
13970 Red Dog Rd.
Nevada City, CA 95959

Kenrick Young
52 Seraspi Ct.
Sacramento, CA 95834

Helga White
310 Bridgeview Dr.
Auburn, CA 95603

Thomas Aceituno
P.O. Box 189
Folsom, CA 95763

Van Durrer
Skadden Arps Slate Meagher & Flom
300 South Grand Ave., #3400
Los Angeles, CA 90071-3144

DATE: November 23, 2010

_____
Deputy Clerk